Filed 4/6/23  In re Avianna M. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re AVIANNA M., a Person Coming Under the Juvenile Court Law. | B313927 (Los Angeles County Super. Ct. No. 20CCJP04179) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KENNETH M., Defendant and Appellant. | |

APPEAL from findings and an order of the Superior Court of Los Angeles County.  Lisa A. Brackelmanns, Judge

Pro Tempore. Affirmed in part, vacated in part, and remanded in part with directions.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Defendant and appellant Kenneth M. (father) appeals from the juvenile court's jurisdictional findings regarding his daughter Avianna M. (Avianna, born Aug. 2019) and the subsequent dispositional order removing her from his custody. He argues that both the jurisdictional findings and the removal order are insufficiently supported by the record. He also contends that the juvenile court and the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with the requirements of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.).

We vacate the juvenile court's finding that ICWA did not apply as to Avianna's mother's side of the family and remand the matter for further proceedings. The jurisdictional findings and dispositional order are otherwise affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Inciting Incident and Family History

In July 2020, DCFS received a referral alleging that Monique S. (mother) had been drinking heavily, getting into physical fights with family members, and generally engaging in

2

conduct that risked the safety of Avianna and her older half-brother (brother).[1]  At the time, mother lived with both children in Long Beach, California; father lived in Arizona.

Mother explained that the family had been living in Arizona until a few months earlier, when conflict between her and father escalated to the point that he held a knife to her throat.  She then sought a restraining order in Maricopa County, which issued in April 2020.  Shortly thereafter, mother permanently left the state, taking the children to live with her family in Long Beach.

In August 2020, father asked DCFS to return Avianna to him.  He admitted to using crystal methamphetamine in the past, but claimed that he had been sober since 2005 (although he later admitted to using drugs in 2007).  Father volunteered that he had recently been incarcerated for three months following a conviction for forgery, and said that the terms of his probation prevented him from leaving Arizona to retrieve Avianna.

## II.  Detention and Jurisdiction Petition

Shortly after father contacted DCFS, Avianna and her brother were both detained with their maternal aunt (aunt).  At the detention hearing, the juvenile court granted father regular monitored visitation with Avianna consistent with the Arizona restraining order.

DCFS then filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (a), (b)(1), and (j),[2]

---

[1]  Neither mother, brother, nor brother's father is a party to this appeal.

[2]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

seeking the exercise of juvenile dependency jurisdiction over the children.[3]  As relevant here, the first amended petition includes two allegations against father:  (1) father had "a history of engaging in violent altercations" with mother, including an incident in which "father held a knife on . . . mother's throat" (§ 300, subds. (a), (b)(1));  and (2) father "has a history of substance abuse including methamphetamine and is a current user of illicit drugs" (§ 300, subd. (b)(1)).  Given Avianna's young age, DCFS argued that these conditions created substantial risks to her health and safety.

### III.  Further Jurisdiction and Status Reports

#### A.  *Mother's Further Statements and Information Regarding the Restraining Order*

In subsequent interviews with DCFS, mother recanted her allegations that father had put a knife to her throat, saying that he had merely gestured at her with a butter knife while cooking. She now attributed their altercations to miscommunication and father's failure to consistently "tak[e] his medication," which she claimed he needed to treat bipolar disorder.  Mother said that her new goal was to reunite with her children so that they could all move back to Arizona and live with father.  When social workers asked mother why she had obtained a restraining order against father in April 2020, she gave nonsensical answers.

Records from the Arizona court indicated that mother and father had a reported history of domestic violence, with many incidents instigated by mother.  The Arizona Department of Child Safety (ADCS) closed its investigation into the family after father was incarcerated and mother moved to California.

---

[3]  In September 2020, this petition was amended to include allegations against brother's father.

On October 1, 2020, the Arizona court declined jurisdiction. It informed the juvenile court that mother and father had recently married in Arizona, but that mother had decided to reside in California until she regained custody of the children.

### B. *Maternal Family's Statements*

DCFS also interviewed Avianna's maternal grandmother (grandmother), who stated that shortly before mother moved to California, mother had called grandmother from a friend's phone to tell her that father had just put a knife to her throat. Grandmother also reported her suspicions that father sold drugs while mother and the children lived with him. She said that, while visiting the family's home in Arizona, she noticed that father had made several holes in the wall, in which he hid baggies of "white powder." She also witnessed people coming to the home asking to buy "nickels."

Aunt reported that mother told her that she had come to California to get away from father because she was scared of him. Mother also confirmed to aunt that father sold drugs while they lived together.

### C. *Father's Psychiatrist's Statements*

Father's psychiatrist confirmed that he had been diagnosed with a mood disorder, unspecified substance abuse, and bipolar disorder. Father was prescribed medication for these issues, but the psychiatrist described father's compliance with mental health treatment as "intermittent." The psychiatrist affirmed that father had completed a domestic violence intake and had "shared about the domestic violence to some extent, but it was hard to get details from him." The psychiatrist also mentioned that father had talked about his substance abuse and had completed a

substance abuse evaluation, but could not provide DCFS with any specific details.

### D.    *Father's Statements*

Father continued to deny any instances of domestic violence between him and mother. He refused to participate in a domestic violence program unless the department could produce a "police report charging him with domestic violence."

Father was amenable to drug and alcohol testing, but consistently refused to participate in domestic violence, psychological or psychiatric evaluations, or mental health services. He also refused to release any additional personal information to DCFS investigators.

## IV.   Jurisdictional and Dispositional Hearing

In March 2021, the juvenile court held a contested hearing on the petition for jurisdiction. At the hearing, father called several witnesses, including aunt and father himself.

Aunt repeated her earlier statements, testifying that mother had told her that she left Arizona because she feared for her safety and the safety of the children if they continued living with father. Aunt also claimed that she had seen multiple messages on mother's cell phone stating that father was not stable and that he could not be trusted around the children; aunt made a report to child protective services and later turned mother's cell phone over to the police. Aunt admitted that mother had a history of lying, but said that she believed mother's accounts of domestic violence.

When father took the stand, he insisted that he had been sober since 2005. He also said that he had been in a 12-step program for 10 years. He denied any domestic violence between him and mother, and backed mother's "butter knife" version of

6

the incident prompting the Arizona restraining order. He claimed that mother had only filed the restraining order so that she could get back into the family's home after he was incarcerated in April 2020. Since then, father asserted that the restraining order had been vacated and that he and mother had married.

In response, DCFS called two witnesses. Its first witness, a social worker who had conducted many interviews since the initial referral, corroborated aunt's accounts of the messages on mother's phone. The social worker remembered one message expressing fear that father "was going to 'beat [mother's] ass and take Avianna.'"

DCFS's second witness was Chelsea Pogue, an ADCS case manager. She confirmed that in March 2020, ADCS became aware of incidents of domestic violence between mother and father. Mother told Arizona social workers that father had stopped taking his prescribed medication, tried to hit her, and threatened to kill her. Mother later brought her concerns to father's probation officer, who told her to get the restraining order.

After hearing arguments on jurisdiction and disposition, the juvenile court found that there had been a serious domestic violence incident in Arizona, which had prompted mother to flee the state with the children. It then sustained both the domestic violence and substance abuse allegations against father. After finding that reasonable efforts had been made to prevent removal, the juvenile court removed Avianna from both parents.

V.    **Appeal**

Father timely appealed.

## DISCUSSION

### I. Jurisdictional Findings

Father contends that the evidence was insufficient to support the juvenile court's jurisdictional findings under section 300, subdivisions (a) and (b)(1).

#### A. Applicable Law

Under section 300, subdivision (a), the juvenile court has jurisdiction over and may adjudge to be a dependent of the court a child who "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."

Jurisdiction also extends, under section 300, subdivision (b)(1), to a "child [who] has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . . [¶] . . . [t]he failure or inability of [his or her] parent . . . to adequately supervise or protect the child . . . ."

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected. . . . [Citation.] 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

#### B. Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence—"evidence that is reasonable, credible and of solid value. [Citations.] We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence. Instead, we draw all

reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J., supra*, 56 Cal.4th at p. 773.)

### C. *Analysis*

Substantial evidence supports the juvenile court's jurisdictional findings based on sustained allegations of father's domestic abuse.[4] The record contains sufficient evidence to conclude that father threatened mother's life, threatened to separate her from Avianna, and caused her to feel such fear for her and the children's safety that she fled the state of Arizona. Arizona court records corroborate that mother and father had engaged in domestic violence on multiple occasions. Mother reached out to social workers and father's probation officer, ultimately succeeding in securing a restraining order against

---

[4] Because we affirm the juvenile court's exercise of jurisdiction on this basis, we need not reach the merits of father's challenge to the juvenile court's exercise of jurisdiction based on father's history of and current substance abuse. (*In re I.J., supra*, 56 Cal.4th at p. 773.) Father asks that we exercise our discretion to review the substance abuse allegation. We decline to do so. (*In re D.P.* (2023) 14 Cal.5th 266, 283.)

father. And she made contemporaneous statements, in text messages and in a phone call to her mother, that father had threatened her life.

On appeal, father continues to strenuously deny that he and mother ever engaged in domestic violence. He contends that all the evidence of his alleged violence against mother relies on the credibility of mother's statements, and that the evidence is thus fatally undermined by mother's patent incredibility as a witness.

We do not deny that the juvenile court could have reached a different result based on the evidence presented. Members of mother's family testified that she had a history of lying, and mother completely changed her story about domestic violence once she decided to reunite with father. However, mother also demonstrated a capacity to tell the truth, as in her repeated statements that father failed to consistently treat his mental illness—statements which were later corroborated by father's psychiatrist. And her original account of father's holding a knife to her neck were substantiated by her contemporaneous expressions of fear as well as her actions in promptly obtaining a restraining order and leaving the state with her children.

Ultimately, after hearing days of testimony from in-court witnesses, the court decided to credit mother's initial statements regarding the domestic violence between her and father. The evidence, while contradictory, supports its decision. (*In re R.V.*, *supra*, 208 Cal.App.4th at p. 843 ["We do not evaluate the credibility of witnesses, attempt to resolve conflicts in the evidence or determine the weight of the evidence"].)

Father also argues that there is no evidence that his prior domestic violence posed a risk to Avianna at the time of the

10

hearing, especially since he and mother were living apart and in different states. However, the record shows that mother and father got married during the pendency of these proceedings. Mother has expressly stated that she intends to live with father and Avianna in the near future. And father has given no indication of awareness or insight into the domestic violence that occurred between him and mother the last time the family lived together. Under these circumstances, the juvenile court could reasonably conclude that father's prior domestic violence history was likely to recur and to pose a substantial risk to Avianna. (See *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598–599 ["the application of section 300, subdivision (a) is appropriate when, through exposure to a parent's domestic violence, a child suffers, or is at substantial risk of suffering, serious physical harm inflicted nonaccidentally by the parent"].)

## II. Removal Order

Father also challenges the evidentiary basis for the dispositional order removing Avianna from his custody.

### A. *Relevant Law*

Before removing a child from parental custody, the juvenile court is required to "make one of five specified findings by clear and convincing evidence. (§ 361, subd. (c).) One ground for removal is that there is a substantial risk of injury to the child's physical health, safety, protection or emotional well-being if he or she were returned home, and there are no reasonable means to protect the child. (§ 361, subd. (c)(1).) "'Clear and convincing' evidence requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations.]' [Citation.] Actual harm to a child

11

is not necessary before a child can be removed. 'Reasonable apprehension stands as an accepted basis for the exercise of state power.'" (*In re V.L.* (2020) 54 Cal.App.5th 147, 154.)

Section 361 also provides that "[a] dependent child shall not be taken from the physical custody of his or her parents, . . . unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

**B.** *Standard of Review*

We review a dispositional order removing a minor from parental custody for substantial evidence. (*In re V.L.*, *supra*, 54 Cal.App.5th at p. 154.) Because the juvenile court must make its finding that a ground for removal exists under the clear and convincing evidence standard of proof (§ 361, subd. (c)), "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

**C.** *Analysis*

The same evidence that supports the juvenile court's exercise of dependency jurisdiction also constitutes substantial evidence from which the juvenile court could find it highly probable that Avianna would be at risk of substantial danger if she was returned to father. (§ 361, subd. (c)(1).)

Father's contrary arguments rely heavily on *In re Basilio T.* (1992) 4 Cal.App.4th 155 (*Basilio T.*) (superseded by statute on

another point, as noted in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1239–1242). In that case, the reviewing court reversed a removal order for insufficient evidence of the substantial risks posed by the parents' domestic violence. The evidence of domestic violence in *Basilio T.* comprised police reports describing two separate domestic violence incidents, neither of which resulted in direct injury to the children; a social study report including statements made by the parents' six-year-old and four-year-old sons, who later recanted their claims and/or were found unqualified to offer testimony, respectively; and reports of further domestic violence made by complaining neighbors, which were directly contradicted by an eyewitness whom the trial court found credible. (*Basilio T., supra,* at pp. 170–171.)

Father argues that this case presents an even stronger record for reversing removal than *Basilio T.*, contending that the only evidence of domestic violence between him and mother is mother's report of one physical altercation, which did not cause any injury to Avianna. His argument ignores the many other pieces of credible evidence demonstrating a pattern of domestic violence between mother and father, including the Arizona investigation into multiple incidents of domestic violence instigated by mother; father's psychiatrist's report that father had completed a domestic violence intake and had reluctantly talked about domestic violence issues during mental health treatment; testimony from an Arizona social worker that mother expressed fear for her life; and mother's ultimate decisions to obtain a restraining order and flee the state with her young children.[5]

---

[5] Father again argues that any evidence connected to mother is incredible and thus cannot constitute substantial evidence. We

13

*Basilio T.* is distinguishable in other ways; notably, by the time of the dispositional hearing, the parents in *Basilio T.* were commended for cooperating with the social services agency, actively seeking out couples counseling, and stating that they were willing to do "'whatever the court [felt was] appropriate in terms of family counseling.'" (*In re Basilio T., supra*, 4 Cal.App.4th at p. 172.) The reviewing court held that this evidence undermined the juvenile court's conclusion that the parents were not adequately participating in services. Conversely, father was largely uncooperative with DCFS throughout the proceedings, and refused to consider participating in domestic violence services or counseling.

Father also argues that the juvenile court failed to consider other options that could have obviated the need for removal, including conditioning custody on "a relative remain[ing] in the home with" father and Avianna; "compl[iance] with a substance abuse program"; compliance with other rehabilitative services; or "frequent . . . unannounced home visits."

Despite father's assertions to the contrary, none of these alternatives offer a reasonable alternative to removal. Father resides in Arizona and has no plans to move to California; this geographic distance alone imposes logistical challenges on the juvenile court's ability to ensure strict supervision of father's progress. Additional difficulties plague father's suggestions. He suggests having a family member move in with him and Avianna, but does not identify any family member in Arizona who could serve as a willing, able, and appropriate monitor. He suggests

---

rejected these arguments when he levied them against the juvenile court's jurisdictional findings; they are equally unpersuasive regarding removal.

mandating various rehabilitative services, ignoring that he has historically refused to participate in any counseling or domestic violence services and denies any need for such services. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163 [finding that reasonable efforts were made to avoid removal where a parent did not participate in services and declined offered services to prevent removal].)

Under these circumstances, the juvenile court justifiably concluded that removal was necessary to protect Avianna.

## III.   ICWA

### A.   *Additional Procedural Background*

When DCFS first asked Avianna's parents about their ancestry, mother indicated that she might have Indian ancestry through her father. Mother later signed an ICWA-020 form indicating that she did not have any known Indian ancestry, repeating this denial in subsequent interviews.

Father asserted that his paternal grandmother was 100 percent Cherokee, although he was not enrolled in any tribe. He repeated this information on a subsequent ICWA-020 form.

On the basis of father's ICWA-020 form, the juvenile court ordered DCFS to conduct further inquiry about father's Native American ancestry. Father's attorney gave DCFS the names of father's parents and grandparents,[6] alleging that father's parental grandfather was also "full-blood Cherokee." When asked, father gave DCFS the names of his paternal great-grandparents, alleging that his paternal great-grandmother had been "100 [percent] Cherokee from [the] Carolina[s]." He refused

---

[6]      Father's counsel also gave birth and death dates for Avianna's paternal grandfather, confirming that he had died in 2002.

15

to provide additional information about his family tree because he was frustrated by how DCFS was handling the case. DCFS asked mother if she had any additional information on father's extended family, but she denied knowing anything about them.

Based on the information father had given them, DCFS sent ICWA notices to the Eastern Band of Cherokee Indians. When father later amended his claim to add that his paternal great-grandmother had been both Cherokee and Mohawk, DCFS sent additional notices to the Saint Regis Mohawk Tribe and the Saint Regis Band of Mohawk Indians.

In September 2020, the Eastern Band of Cherokee Indians notified DCFS that it did not consider Avianna to be an Indian child. One month later, the Saint Regis Mohawk Tribe reported that Avianna was neither enrolled as a member of the tribe nor eligible for membership. The Saint Regis Band of Mohawk Indians never responded.

At the jurisdictional and dispositional hearing, the juvenile court found that ICWA did not apply.

**B.** *Applicable Law*

"ICWA was enacted to curtail 'the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement' [citation], and 'to promote the stability and security of Indian tribes and families by establishing . . . standards that a state court . . . must follow before removing an Indian child from his or her family' [citations]."[7] (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 780, review granted Sept. 21, 2022, S275578.)

---

[7] An "'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the

16

Under California law enacted to implement ICWA, DCFS and the juvenile court have "three distinct duties . . . in dependency proceedings." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.) The first is the initial duty of inquiry, which DCFS "discharges . . . chiefly by 'asking' family members 'whether the child is, or may be, an Indian child.' ([§ 224.2], subd. (b).) This includes inquiring of not only the child's parents, but also others, including but not limited to, 'extended family members.' (*Ibid.*) For its part, the juvenile court is required, '[a]t the first appearance' in a dependency case, to 'ask each participant' 'present' 'whether the participant knows or has reason to know that the child is an Indian child.' (*Id.*, subd. (c).)" (*In re Dezi C.*, *supra*, 79 Cal.App.5th at p. 780; see also Cal. Rules of Court, rule 5.481(a)(1)-(2).) The second duty—the duty of further inquiry—is triggered if there is "reason to believe that an Indian child is involved" (§ 224.2, subd. (e)), while the third duty—to notify the relevant tribes—is triggered if there is "reason to know . . . that an Indian child is involved" (§ 224.3, subd. (a)).

Numerous appellate courts have weighed in recently on the consequence, on appeal from an order prior to termination of parental rights, of a social services agency's failure to conduct the required initial ICWA inquiry.[8] At least five different types of dispositions have emerged. (See *In re Dominick D.* (2022)

---

biological child of a member of an Indian tribe[.]" (25 U.S.C. § 1903(4); see also § 224.1, subd. (a) [adopting federal definition].)

[8] Appellate courts have also issued a spate of opinions on the proper remedy in an appeal from an order terminating parental rights when the ICWA duty of initial inquiry has not been satisfied. (See *Dezi C.*, *supra*, 79 Cal.App.5th at pp. 777–778.) We need not address that issue here.

82 Cal.App.5th 560, 563–564, 567–568 (*Dominick D.*) [affirming the juvenile court's jurisdictional and dispositional findings and orders, vacating the finding that ICWA did not apply, and remanding for ICWA compliance]; *In re S.H.* (2022) 82 Cal.App.5th 166, 171 ["hold[ing] that when a social services agency accepts its obligation to satisfy its inquiry obligations under ICWA, a reversal of an early dependency order is not warranted simply because a parent has shown that these ongoing obligations had not yet been satisfied as of the time the parent appealed" and affirming findings and orders in their entirety]; *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638–639 [dismissing appeal as moot on the theory that no effective relief could be provided]; *J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, 461 [finding that ICWA issue was unripe for review as "any perceived deficiencies with ICWA inquiry and noticing may still be resolved during the normal course of the ongoing dependency proceedings"]; *D.S. v. Superior Court* (2023) 88 Cal.App.5th 383, 387–389, 391–392 [construing appeal as a writ petition seeking order directing compliance with ICWA duties and, upon consideration of the merits, granting the requested relief].)

### C.     *Standard of Review*

"On appeal, we review the juvenile court's ICWA findings for substantial evidence. [Citations.] But where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied. [Citation.]" (*In re D.S., supra,* 46 Cal.App.5th at p. 1051.)

### D.     *Analysis*

#### 1.     *Errors regarding Avianna's maternal family*

Father argues that DCFS and the juvenile court failed to satisfy their initial inquiry duties as to Avianna's maternal

18

family, identifying eight maternal relatives that DCFS failed to interview on the question of Indian ancestry. DCFS concedes that this was error, and we agree that DCFS failed to discharge its initial duty of inquiry as to mother's family. (See § 224.2, subd. (b) [requiring DCFS to question "'extended family members'" about possible Indian ancestry]; *Dezi C.*, *supra*, 79 Cal.App.5th at pp. 776–777.)

Having found ICWA error, we must determine the remedy. We elect to follow *Dominick D.*, *supra*, 82 Cal.App.5th 560 and vacate the juvenile court's finding that ICWA does not apply as to mother's family, remand for compliance with ICWA and related California law, and otherwise affirm the jurisdictional findings and dispositional order.

In so doing, we recognize that the juvenile court and DCFS "have an affirmative and continuing duty to inquire" into the minor's Indian status as these dependency proceedings continue. (§ 224.2, subd. (a); see also *In re Isaiah W.* (2016) 1 Cal.5th 1, 14; *In re S.H.*, *supra*, 82 Cal.App.5th at pp. 176–177.) DCFS "has a duty 'on an ongoing basis' to report 'a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status.' ([Cal. Rules of Court, r]ule 5.481(a)(5).) And the juvenile court, even after it concludes that ICWA does not apply, retains the power (and duty) to *reverse* that determination 'if it subsequently receives information providing reason to believe that the child is an Indian child.' (§ 224.2, subd. (i)(2); see also [Cal. Rules of Court,] rule 5.482(c)(2).)" (*In re S.H.*, *supra*, at p. 176.) Thus, while in some respects, there may be no reason to remand this case at all, we also recognize that we should not allow an erroneous finding to stand when it can be corrected.

2.    *Errors regarding Avianna's paternal family*

Father also argues that insufficient inquiries were conducted as to father's extended family, identifying multiple family members who DCFS failed to locate and interview. Again, DCFS concedes error.[9]

We do not agree with the parties that there was ICWA error concerning Avianna's paternal family. On appeal, father chastises DCFS for not attempting to find out if father's grandmother and great-grandmother were still alive, and, if so, whether their contact information was readily obtainable. But the record shows that father rebuffed DCFS's efforts to obtain more information about these relatives, effectively stymieing further investigation.

Specifically, father was unable or unwilling to provide contact information for any of the relatives he named. And notably, he provided only one birthdate: that of his father, who he admitted had passed away in 2002 at the age of 73. Had Avianna's paternal grandfather been available for comment when this case commenced, he would have been 92 years old; it is highly unlikely that her more distant paternal relatives, including her grandfather's mother and grandmother, would have been alive and available for comment in the year 2021. (*See In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1413 [remand for further investigation of potential Indian heritage is futile when all extended relatives identified as potential sources of

---

[9] While DCFS concedes error, it argues that the error was harmless. We need not address this issue "because ICWA inquiry and notice errors do not warrant reversal of the juvenile court's jurisdictional or dispositional findings and orders other than the ICWA finding itself. [Citations.]" (*In re Dominick D., supra,* 82 Cal.App.5th at p. 567.)

information are dead and when living relatives cannot produce additional information].)

Father admits that he often refused to cooperate with DCFS's investigation, including refusing to give additional information about his extended family members for the purposes of conducting an ICWA investigation, but argues that DCFS "should have worked harder to develop a greater rapport with [father] so [that] he better understood what was going on and why the social worker did things the way that they [sic] did." The sole legal authority father cites for this proposition is inapposite. (See *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 787 [merely holding that social service agencies "must pursue all reasonable investigative leads" even when no specific tribal connection has been suggested]; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 ["The absence of cogent legal argument . . . allows this court to treat [an appellant's] contentions as waived"].)

We are compelled to note that despite father's failure to provide DCFS with complete information, it still attempted to discover more information about his extended family—including by asking mother, who had no further leads—and ultimately sent notices to all three tribal entities identified by father as potential sources of Indian ancestry. Two of those tribes responded that Avianna was not an Indian child, and the final tribe gave no response. Under these circumstances, we conclude that the juvenile court's ICWA finding concerning father's family was not erroneous.

That said, as set forth above, this matter is an ongoing proceeding. The juvenile court and DCFS "have an affirmative and continuing duty to inquire" into Avianna's Indian status as

these dependency proceedings continue.  (§ 224.2, subd. (a); see also *In re Isaiah W.*, *supra*, 1 Cal.5th at p. 14; *In re S.H.*, *supra*, 82 Cal.App.5th at pp. 176–177.)  Should father provide any additional information, including contact information for identified relatives, then DCFS and the juvenile court should act accordingly.

## DISPOSITION

The juvenile court's finding at the jurisdiction and disposition hearing that ICWA did not apply as to mother's side of the family is vacated.  The matter is remanded for further proceedings in which (1) DCFS shall make reasonable efforts to ask all known and available maternal family members whether Avianna is or may be an Indian child; (2) DCFS shall document these efforts to the juvenile court; (3) the juvenile court shall make a finding regarding ICWA's applicability as to mother's family; and (4) depending upon that finding, the juvenile court and DCFS shall proceed in accordance with sections 224.2 and 224.4.  The jurisdictional findings and removal order are otherwise affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
LUI

_____, J.
CHAVEZ

22